## Lau *versus* Mumma.

*Admissibility of Ancient Documents.— Construction of Agreement as to Water-Right.*

1. The rule of evidence for ancient documents is that they must have the appearance of due antiquity and of genuineness: they must be procured from the proper custody, and be corroborated by such acts of the parties claiming under them as correspond with their tenor.

2. In an action against a mill-owner brought by an adjoining owner for flooding his land by rebuilding his dam higher than before, the defendant, to maintain the right to raise his dam, offered in evidence a paper purporting to be an agreement between the former owners of the land, dated in 1773, relating thereto, which was recorded in 1805, entered as a copy of the original, and noted on the record as such by the recorder at the time. *Held*, that the paper was not admissible in evidence without further proof of its genuineness, and that its admission by the court below was error.

3. By the agreement the grantor bound himself and his heirs to the grantee and his heirs, that he would allow the grantee to build a dam three feet high, at a place named, and if desired, above three feet high till it overflowed three acres of the bottom, which the grantor was to convey to the grantee for a specified price per acre for the land overflowed by raising the dam above three feet, but not higher than to overflow three acres: *Held*, that the agreement was not a present grant of an easement to flood three acres of land (then belonging to the grantor and now to the plaintiff), beyond what would be flooded by a three feet dam, but was executory only, made in reference to a dam then in contemplation, or to be built within a reasonable time, the land flooded by which, when built, was then to be bought and paid for at the price named, and not a contract for the purchase of land to be flooded in an unknown future.

ERROR to the Common Pleas of *York county*.

These were actions on the case brought by George Lau against Samuel Mumma, for flooding the land of the plaintiff by means of a mill-dam erected on defendant's land in 1850.

The plaintiff first brought suit in 1851, after which the dam was broken. Subsequently, the dam was repaired by the defendant, and in 1860 a second suit was brought for erecting and continuing the dam. To declarations in the usual form, the defendant pleaded the general issue, and both cases were tried together.

The material facts, as disclosed on the trial, were as follows :—

The land now owned by the parties belonged at one time to Christian Lau, the great-grandfather of the plaintiff; but at a very early date, to wit, in 1769, the title to the land now owned by defendant was vested in Henry Bare. There was a mill there before that time, which in 1805 was rebuilt by Henry Bare, which mill was subsequently taken away by Samuel Mumma, and another one erected.

The heirs of Henry Bare conveyed to Daniel Bare, the 3d of November 1812. Daniel conveyed to Samuel Bare the 6th of

April 1833, and Samuel conveyed to Mumma, the defendant, the 13th of April 1839.

In the fall of 1850, Samuel Mumma put in a new dam a short distance below the old one, which is the structure of which the plaintiff complained. He alleged that this new dam was higher than the old one, and caused the water to overflow his meadow and spring to a greater extent than it had done prior to 1850.

Old Christian Lau, prior to 1770, owned three hundred and forty-seven and a half acres; and on .the 11th of January of that year, conveyed the undivided half to his son, Michael Lau, "excepting the right, liberty, and privilege of a certain, race or watercourse on the same land, made for the use of the owner, occupier, or possessor of that part, whenever the mill is erected and built, for ever."

On the 20th of July 1773, the heirs of Christian Lau, to wit, Michael and Peter Lau and Elias Eyster, who was married to a daughter of Christian Lau, conveyed the mill tract, &c., containing eighty acres, more or less, to Casper Carver. On the same day, Michael Lau and Casper Carver, the vendee, entered into an agreement by which Lau agreed to permit Carver to build a mill-dam on the Codorus creek, on Lau's land, at the place where the old bridge formerly stood, three feet high. But if Carver desired a dam more than three feet high, he had the privilege of building till it overflowed three acres of the bottom land, but no more. Lau, for himself and his heirs, further agreed that if Carver, his heirs or assigns, required a conveyance of the three acres of land, or a less quantity, which should be overflowed by the dam, then Carver was to pay 5*l.* for every acre which should be overflowed on account of the raising of the dam, and that Carver would not make it higher than to overflow three acres. This agreement was recorded the 19th of September 1803. Carver conveyed the mill property, to which this right was appurtenant, to Henry Bare, on the 23d of December 1789, and the title passed from Bare to the defendant, Mumma, in the manner before stated.

Michael Lau, the party to the agreement above recited, by his will, proved the 15th of June 1795, devised two hundred and eighty-seven and a half acres, which included the land upon which this right to build a dam and flood three acres was granted, to his son Michael. Michael Lau, Jr., by deed dated 1st of July 1839, conveyed three adjoining tracts, containing three hundred and six acres in all, and including the two hundred and eighty seven and a half acres devised to him by his father, to his three sons, John, Michael, and Jonas.

On the 2d of July 1839, John Lau assigned his interest in the three hundred and six acres to his brother, George Lau, the present defendant, and on the 13th of September 1839, upon

[Lau v. Mumma.]

partition being made between Michael, Jonas, and George, one hundred and one acres and one hundred and twenty perches were conveyed to George, which included the land upon which old Michael, the grandfather of the plaintiff, had granted the privilege of erecting a dam and flooding three acres.

On the trial, the defendant, as part of his defence, offered in evidence sundry deeds, drafts, and patents, showing ownership of both properties by Christian Lau; the conveyance of the undivided moiety to his son Michael; the death of Christian Lau intestate; the conveyance by his heirs, July 20th 1773 and May 15th 1781, to Casper Carver; and then offered in evidence the following paper :—

"*Artickle* of agreement made *&* *Concluted* on this 20th Day of July Anno Domini 1773 Between Michael L*ow* of Manchester Township. York County & State of Pennsylvania Freeholder of the one part and Casper Kerber of Paradise Township in the County & Province aforsaid of the other part. Witnesseth that the above mentioned Michael L*ow* for himself his Heirs Executors & administrators and for each & every of them To *thess* Presents Doth Bargain and Bind himself with the aforesaid Casper Kerber, or to his Heirs or Assigns That he the said Michael Lau his Heirs, Shall & will allow unto the aforesaid Casper Kerber to build a Mill Dam three feet high across the Codorus Creek at the Place where the Old Bridge formerly *Stod* in the Township of Manchester On the aforesaid Michael Laus land and to Continue as far as the Mill Race and farther if the aforesaid Kerber is Desirous of having the Dam above three feet *heigh* he has the Liberty of Building till it overflows three Acres of *of* the bottom Land but no more, and that the Said Michael L*ow* or his Heirs, shall and will if the above Casper Kerbers his heirs or assigns should *required* a *sufficent* Conveance of the above three. Acres of land or A less quantity which the aforesaid Dam shall Cause to overflow as before Described, And the *aforsaid* Casper Kerber his Heirs Executors Administrators and Every of them doth agree *withe* the aforesaid Michael L*ow* and his Heirs or Assigns by *thess* Presents, That if the above Casper Kerber, his Heirs Shall and do well and Truly pay or Cause to be paid unto the aforesaid Michael Lau the Sum of Five pounds Current money of Pennsylvania for Every Acre of land Which *shahll* be overflowed on Account of the raising of the aforesaid Dam above the *thre* feet aforesaid, and that he will not make it *heigher* than to overflow *thre* Acres. And for the true Performance of every of the above *Artickles* and Agreement before *Discribed*, The Parties Bind *themself* each unto the other in the Sum of One hundred Pound Current money of *Pennsylvan*

[Lau *v.* Mumma.]

In Witness whereof we have hereunto Set our hand and Seals the Day and Year above writ*tin*.

"Sealed & Delivered in
the Presence of us.                                    "MICHAEL LAU
"JOHANNES EHMIG·              ,              "CAS QER CARVER
"HENRY MILLER

"York County, ss.

"Before me the Subscriber one of his Majesty *Justicses* of the County Court of Common pleas of the aforesaid County *Cam* the *Michal Low* and acknowledged the above *artickle* and desired the same to be recorded. In Witness whereof I have hereunto Set my hand Seal this twenty Day of *Jull* A : D : 1773
                              "MARTIN EZEHELBERGER"

"Recorded in the Office for Recording of Deeds in and for the County of York in Book Q. Q. page 520 &c
               "Given under my Hand and the Seal of said office at York the Nineteenth Day of September Anno Domini 1803.                              ·
                              "J. BARNITZ, Recorder

"The foregoing appears not to be an original but might be copy'd from the original.                              "J. B.
"(It is copy by Dr. Kling.)"

There were no seals on the paper. The body of the writing and signatures, as well as the acknowledgment below, appeared to be in one handwriting and the same ink. Mr. Barnitz, the recorder, noticed this on the record, and added that "the name of Henry Miller is not Gen'l Miller's writing." The name of the other witness, and also the names of the alleged parties, as subscribed to the paper, were in the German manuscript character, and were written by one person.

It was objected to by the plaintiff, but admitted by the court, which admission is the subject of the first assignment of error.

This was followed by deed of Carver to Henry Bare, December 23d 1789; deed of Henry Bare's heirs to Daniel Bare, April 15th 1811; deed of Daniel Bare and wife to Samuel Bare, April 8th 1833; and Samuel Bare and wife to defendant, April 13th 1839, &c.

It also appeared on the trial, that the new dam was built some perches above the place where the bridge referred to in the above agreement had stood.

The defendant also offered in evidence the declaration of Michael Lau, grandson of Christian Lau, "for the purpose of showing that the height of the water in the dam for the use of the mill, long before the new dam was built, swelled the water

[Lau *v.* Mumma.]

into the spring and upon the premises along the banks of the creek or dam complained of in the suit." Which was objected to by the plaintiff, but admitted by the court under exception.

The plaintiff requested the court to charge the jury:—

1. That whatever rights the defendant might have had connected with what is called the old dam, they afford no justification of the injuries alleged to be occasioned to the plaintiff by the erection of the new dam.

2. That the articles of agreement of 1773, between Michael Lau and Casper Carver, admitted in evidence under exception, did not authorize the defendant to erect this new dam, nor does it authorize him to maintain it.

3. That the said agreement being executory in its character, and there being no evidence of any assertion of right under it, or notice of its existence for a long period of years, it was too late in 1850 to claim anything under it, and the jury should presume an abandonment of its benefits, and the defendant, if he would have been otherwise entitled, cannot claim specific performance of it against the plaintiff.

· 4. That the said agreement of 1773, between Michael Lau and Casper Carver, if the defendant can claim under it, does not confer a right upon the defendant to flood more land than three acres, and if the dam erected by him floods more than three acres on his own part of the original tract, he has no right under it to flood any of the land of the plaintiff.

Among the points presented ·by the defendant were the following:—

2. That the articles of agreement between Michael Lau and Casper Carver, dated the 20th day of July 1773, constitute a grant of an easement upon the land of the said Michael Lau, continuing in favour of the owner or occupiers of the mill property, conveyed to Casper Carver by deed of the same date, as assigns of Casper Carver, to be used by them, or any of them, whenever they, or any of them, might find it necessary or proper to enter upon the enjoyment of the same.

3. That the said articles of agreement bind the assignees of each of the parties thereto to the covenants contained in said articles, and if the jury believe that the title of the defendant is derived from Casper Carver, and the title of the plaintiff from Michael Lau, they are mutually bound to the covenants therein contained.

7. That the grant of Michael Lau ought to be construed with reference to the existing rights of the mill-owner at the time of the grant, and the things *in esse*, viz., the mill and the water-power and the necessary head of water for the mill, for the benefit and enjoyment of which the grant was made, and as regards any limitations in said grant that detract from or interfere with the

full enjoyment of such existing rights and things, they should be construed most strongly against the grantor.

8. That if the defendant is entitled to erect a dam under said grant, he has the privilege of erecting such dam three feet high in the first instance, and that the proper construction of the grant is that if he is desirous of raising it higher, he has the right to cover three acres of the bottom land over and above what a dam three feet high would cover.

9. That if the jury believe that the water backed by the defendant's dam, over the line of the plaintiff, is in channels and gutters existing before the erection of the dam, and through which the water-power of the defendant escaped and was lost to him, and that the banks of any of those channels are not overflowed at any time so as to affect materially the land of the plaintiff, he cannot recover under the facts of this case.

10. That if the jury believe that what has been styled the old dam, backed the water up the creek to the defendant's spring, and that during any portion of the time when the mill owned by plaintiff was used by former owners, when the old dam was in proper repair, and there was the necessary head of water at the mill, the water flowed into plaintiff's spring-house, the defendant cannot be prejudiced in this suit, though there may have been intervals when the old dam was out of repair, in which the water did not come into the plaintiff's spring.

The points presented by the plaintiff were answered thus:—

"1. We cannot answer this point as requested. If the old dam, which the evidence shows must have been erected more than fifty years ago, swelled the water back upon plaintiff's land as far as the present dam, it would be a justification of the injuries complained of by plaintiff.

"2. We cannot answer this in the affirmative, we have referred more particularly to the right to erect the present dam in our general charge.

"3. The agreement was appurtenant to the mill property, and the right passed to the different owners. The doctrine of abandonment does not apply to written agreements of this nature, unless there was a denial of the right, or the defendant by his acts and conduct had denied its validity. We therefore cannot answer this point as requested.

"4. This is not the proper interpretation of the agreement, we have stated its meaning in our general charge."

The defendant's points were answered as follows:—

"2. We answer this point in the affirmative; if the right granted had not been denied or repudiated by the owners of the land upon which the easement was granted.

"3. We answer this point in the affirmative, subject to the qualification mentioned in the preceding point.

" 7. As a general principle of law this point is correct.

" 8. Answered in the affirmative.

" 9. In ascertaining the quantity of land flooded by the new dam, it would be proper for you to exclude the land covered by the channels of the stream before the erection of the new dam.

" 10. If, when the old dam was in proper repair as generally used by the owners, it flowed into plaintiff's spring, an occasional break, or the dam becoming leaky, or out of repair, would not deprive defendant of the right of raising the water to its usual or accustomed height."

In the general charge, the court, after stating the case fully, instructed the jury as follows :—

" The plaintiff must therefore have seen and known of the commencement and progress of the dam by Mumma. If he did, and did not remonstrate or object to the slight change of location, but permitted Mumma to go on and complete the dam without objection, he cannot now be permitted to say that, because defendant had not built his dam in the very place designated, he cannot avail himself of the agreement of 1773.

" Carver had first the right to build a dam three feet high at the place designated, no matter to what extent the water overflowed Lau's land. And then he had the further right to build it as much higher as would flood three acres, in addition to that flooded by a three feet dam, and for the excess, which was not to exceed three acres, he was to pay five pounds per acre.

" Was there more than three acres of land flooded above a point on the stream, to which a dam at the old bridge three feet high would swell the water ? If there was, the plaintiff would be entitled to damages for the injury done to the excess over three acres thus injured. But if the evidence fails to satisfy you that there was more than three acres flooded, above a point to be ascertained as we have stated, then you ought to find for the defendant.

" Upon partition being made between Michael, Jonas, and George, one hundred and one acres one hundred and twenty perches were conveyed to George, which includes the land upon which old Michael, the grandfather of the plaintiff, had granted the privilege of erecting a dam and flooding three acres."

Under these instructions there was a verdict and judgment in favour of the defendant. Whereupon the plaintiff sued out this writ, and assigned for error the admission of the paper purporting to be an agreement between Michael Lau and Casper Carver, dated July 20th 1773 ; the answer given to the four points presented by the plaintiff; the answer given by the court to the above points of the defendant ; the language used by the court in the general charge ; and the admission of the declarations of Michael Lau as to the height of the water.

[Lau *v.* Mumma.]

*Evans & Mayer*, for plaintiff in error.

*A. N. Green*, *Henry L. Fisher*, and *John Gibson*, for defendant in error.

The opinion of the court was delivered, October 10th 1862, by
LOWRIE, C. J.—The plaintiff sues for the flooding of his land by means of a dam rebuilt by the defendant in 1850, and, as the plaintiff alleges, raised higher than the old one was. The defendant, to maintain his right to increase the height of his dam, relies on an old agreement between the former owners of the plaintiff's and defendant's tracts, dated in 1773, and the principal questions in the cause grew out of the admission in evidence and interpretation of this old document.

Of course we cannot expect to obtain direct oral proof of the genuineness of such a paper, and therefore we must accept traditional evidence of it unless it has been so perpetuated by legal record as to dispense with all other evidence. Even the traditionary evidence cannot be expected to relate directly to its execution, but must generally be concerning such collateral and incidental facts as require the presumption of the execution in order that we may reasonably account for them. Hence the ordinary rule of evidence for such ancient documents is that they must have the appearance of due antiquity and of genuineness; that they must be procured from the proper custody, and that they must be corroborated by such acts of the parties claiming under them as correspond with their tenor, and need their provisions to account for them.

No doubt this paper may have sufficient appearance of antiquity; but has it also the appearance of genuineness? It was recorded in 1803, and the recorder added a note to the record that the paper was not the original, but only a copy, and endorsed the same on the paper, and thus it stood when it was given in evidence. This state of the paper and of its record must have been known to the plaintiff and his predecessors in the title of the mill property, and considering that they had a right to demand its record without note or comment by the recorder, if he was satisfied of the genuineness of the certificate of acknowledgment, and yet accepted the record with the above-mentioned note of the recorder, who seems to have known the handwriting of some of the persons named, we know not how we can say that the paper appeared to be genuine. And if the whole paper with its signature appears, as was said at the argument, to be one handwriting, and the signature of a witness who was not German appears to be written in a German style of penmanship, the appearance of its want of genuineness would be increased. Not having the paper before us now, we pass this

reason without applying it; but for the first reason above assigned, it seems to us that the paper ought not to have been admitted as evidence of a grant made in 1773.

Nor does it seem to us that the paper, as understood now by the defendant, is corroborated by any acts of the parties corresponding to the claim now made under it. We exclude the act now complained of, which is comparatively recent, for it cannot confirm or corroborate its own right. No doubt we need to find or presume a grant to account for the flooding that existed up to 1850; and the fact of this flooding would be corroborative of any grant which appeared to be genuine, and which would apply to such flooding. The actual flooding of the first seventy-five years cannot possibly corroborate a claim for further flooding since that time. If this agreement means that the defendant may increase the height of his dam beyond what it stood at for seventy-five years, then and thus far it has no corroborative acts in support of its genuineness.

But the paper or its original may possibly be admitted on further evidence on the next trial, and therefore we must consider what may be its true value or interpretation. In the court below it was treated as a present grant of an easement to flood three acres of the land now belonging to the plaintiff, beyond what would be flooded by a three feet dam. Is this right? Is it a present executed grant at all; or only a contract to sell not exceeding three acres of land if it should be wanted for a millpond? Let us abridge the language of the agreement so that we may get its thought clearly.

The grantor binds himself and his heirs to the grantee and his heirs that he will allow the grantee to build a dam three feet high at a place where a specified bridge formerly stood, and if the grantee desires he may build above three feet high till it overflows three acres of the bottom, but no more; and the grantor will, if the grantee desires it, make a sufficient conveyance of the three acres or less of land which shall be so overflowed, and the grantee shall pay 5l. per acre for all the land that shall be overflowed *by raising the dam above three feet,* and shall not make it higher than to overflow three acres. And for the fulfilment of this the parties bind themselves to each other in 100l.

Now it is plain enough that a three feet dam was expected to cause some flooding of the plaintiff's land, and that for some reason no charge is made for this; but that the grantee was to pay for all land that should be flooded by making the dam higher than three feet. We see nothing, however, that convinces us that the grantee was to be allowed to flood three acres beyond the effect of a three feet dam. And the interpretation of the parties for three quarters of a century, and the twice declared provision, that no more than three acres should be flooded, do not favour

the defendant's interpretation. It is unreasonable in another aspect; for there is to be a conveyance in fee for only the three acres or less, and according to it, none is provided for relative to the part covered by the three feet dam, and therefore the defendant would have a fee simple in a patch of the plaintiff's tract, and an easement in a strip lying between that patch and the defendant's land. Ignorant people may fall into very absurd bargains, but they could hardly invent of purpose one so complicated and absurd as this one would seem to be if we adopt the defendant's interpretation.

But is this an executed, or only an executory agreement, in and of itself? We cannot avoid the conclusion that it is only executory. Up to the time of its date there was no right to flood the land that now belongs to the plaintiff, and then there was a contract to allow it. It allows, without charge, so much flooding as a three feet dam would cause; but the extent of the grant beyond that is not defined in the agreement. It is to depend on the choice of the grantee, subject to the limit of three acres, and the price is to be fixed accordingly, and a conveyance in fee is contemplated·when the whole extent of it is ascertained. It makes no essential difference that the conveyance was to be made only if the grantee should require it; for still it shows that the parties did not consider the agreement as an executed conveyance. And, merely formal as the concluding penalty sometimes is, it shows the same thing, unless we attribute utter ignorance of language to the parties.

And when was the grantee to choose how much land he would want to flood? It seems to us that there can be no reasonable answer to this but the following : when he should come within a reasonable time to erect the three feet dam, which they were then contracting about. There is no word in the agreement that alludes to any other time, and therefore we must infer that the parties were thinking of no other. They were contracting for the height that was to be given to the dam which was then in contemplation, and not for any height that might be desired in any undefined future time. The price was set according to the value of land then, and not at what it might be in 1850, possibly fifty fold greater. What was then flooded was to be then bought and paid for : and there was no purchase of any that was to be flooded in an unknown future.

And it is plain that, if the grant be an executed one, it was executed as a conveyance of not over three acres of land, and not of an easement ; and then the right would have been barred long before 1850 by the Statute of Limitations, if the plaintiff and his predecessors continued in open and adverse possession of it all the time, as no doubt they did.

And if the language were doubtful, we should incline to treat

[Lau *v.* Mumma.]

such an agreement as executory, because of its very nature, and because of the inconveniences that would attend the treatment of it as executed.   A sale of a piece of land or of an easement on it, at a given price to be paid whenever the grantee, his heirs or assigns, in all future time, may choose to pay for and claim it, is simply absurd, whether the law would enforce it or not. Whether it grant land or easement, it necessarily stops all improvements and all proper enjoyment of the land, if it be valid and clear.   If it be doubtful or unknown, it may come in and sweep away the most costly improvements and most cherished objects; especially if it be an easement, because that as yet is subject to no Statute of Limitations, unless it may be in the form of equitable analogies.

Another evidence, that the parties were thinking only of a dam that was to be built at that time, or within a reasonable time, is that the place was fixed by the remains of an old bridge that had formerly stood there, and the dam was to be three feet high, measured from the ground at that place as it then was.   The monument is evidently quite temporary and changeable; and who can tell after near ninety years where that old bridge stood, and how much the creek bottom may have filled up at that place? And this is of essential importance if performance of the contract is to be enforced now.   But if it was performed by the dam built at or about that time, then the amount of actual flooding since that becomes the best measure of the right.

Even on the defendant's own theory of interpretation, it is impossible for him to justify his new flooding of the plaintiff's land without showing us what was the bottom of the creek at the place of the old bridge, and that his flooding does not exceed three acres beyond the effect of a dam raised three feet above that level.   This would seem to be impossible at this late period; and we cannot suppose that the parties were contracting for a choice that was to be made at a distant future.

Besides this, though not of very convincing importance considering the usual want of exact accuracy in all writings, it can hardly be regarded as entirely unimportant that, in describing the grantee, " his heirs and assigns" is added in all places except where speaking of who may erect the dam and decide upon its height.   Then the grantor alone is spoken of.   This at least corresponds with, if it does not corroborate the views already expressed.   We conclude, therefore, that the agreement is an executory contract.   In law, therefore, it vested no title in the defendant, and can furnish no legal justification for his new flooding of the plaintiff's land.   And equity cannot regard it as vesting any equitable title, so far as it was not performed within a reasonable time.   So far as the agreement was actually performed by the parties about the proper time, by the erection and

overflow contemplated, equity will treat it as executed and hold the parties to it, and so will the law with us.

Hence the important question of the cause appears to be, did the defendant by his new dam made in 1850 increase the flooding of the plaintiff's land beyond what was usual, before that time? If the agreement be proved, it will be taken as having been performed by the parties, and their rights will be measured by the observed extent of the actual performance. If no agreement appear, a grant of an easement to the same extent will be presumed, and the plaintiff will have to show that the defendant has exceeded that.

And it seems to us that if we read the contract according to these views, not only do all its parts harmonize together, but the whole is in perfect harmony with its first performance. Without the agreement the defendant has an easement in all that has been usually flooded; with it he would have a fee simple, for the law presumes the consideration to have been paid. He would have under the agreement a fee simple in all that he had flooded, and not a fee simple for the further part of it, and an easement for the intervening strip. Up to 1850 the quantity flooded seems to have been near three acres, though the dam was not built at the place designated. And even if it were much less it must now be taken as showing how far the grantee chose to have his right extend, or as a full performance of the agreement as then understood; and so also if it were more. The place of the dam was of no importance at all to the grantor, except as a means of ascertaining the portion of the land overflowed which the grantee was to pay for, and that question has long gone by.

We do not discover any other error of which the plaintiff can reasonably complain that it did him any harm.

Judgment reversed, and a new trial awarded.